UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| AKER SOLUTIONS, INC. | CIVIL ACTION |
| VERSUS | NO. 16-2560 |
| SHAMROCK ENERGY SOLUTIONS, LLC; AND SAMURAI INTERNATIONAL PETROLEUM, LLC | SECTION M (4) |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

This matter involves unpaid invoices for services rendered where the obligation and the obligor are disputed. Plaintiff Aker Solutions, Inc. ("Aker") filed this suit against defendants Shamrock Management, LLC d/b/a Shamrock Energy Solutions ("Shamrock Management"), Shamrock Energy Solutions, LLC ("Shamrock Energy"), Samuari International Petroleum, LLC ("SIPCO"), and Jeffrey Trahan (collectively, "Defendants") alleging that SIPCO is obligated by contract to Aker in the amount of $1,780,144.19 for work performed, and SIPCO breached the contract by failing to pay.[1] Aker alleges that Shamrock Management, Shamrock Energy, and Trahan are also jointly and severally liable for SIPCO's debt under single-business-enterprise and alter-ego theories.[2]

This matter was tried before the Court, sitting without a jury, over two days. Having considered the evidence admitted at trial, the arguments of counsel, and the applicable law, the Court issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such, and vice versa.

---

[1] R. Doc. 77.
[2] *Id.*

## FINDINGS OF FACT

### I.  THE PARTIES

1.      Aker is a corporation organized under the laws of the State of Delaware, with its principal place of business in Houston, Texas.  In general, Aker provides a wide variety of engineering and technical services and solutions to oil-and-gas exploration-and-production ("E&P") companies.[3]

2.      Shamrock Management is a limited liability company formed on September 24, 1997, under the laws of the State of Louisiana, with its principal place of business in Houma, Louisiana.  Trahan purchased Shamrock Management in 2008 and was the sole member and manager of the company during the relevant period.[4]

3.      Shamrock Energy is a limited liability company formed on February 13, 2014, under the laws of the State of Louisiana, with its principal place of business in Houma, Louisiana.  Trahan was the sole member and manager of the company during the relevant period.[5]

4.      SIPCO is a limited liability company formed on February 4, 2013, under the laws of the State of Louisiana, with its principal place of business in Houma, Louisiana.  Trahan was the sole member and manager of the company throughout its existence.[6]

5.      Shamrock Management, Shamrock Energy, and SIPCO are all located at the same business address: 4800 LA-311, Houma, Louisiana 70360.[7]

---

[3] R. Doc. 109 at 3.
[4] *Id.* at 3 & 12; Exhibit 1; Testimony of Trahan.
[5] R. Doc. 109 at 3 & 12; Testimony of Trahan.
[6] *Id.*
[7] R. Doc. 109 at 3.

6.     Trahan is a citizen of Louisiana residing in Houma.  Trahan is the sole member of Shamrock Management, Shamrock Energy, and SIPCO, none of which is publicly traded. Trahan is also president and chief executive officer ("CEO") of Shamrock Management and SIPCO and provides the funding for both companies.[8]

## II.     SIPCO'S RELATIONSHIP WITH SHAMROCK MANAGEMENT AND SHAMROCK ENERGY

7.     Shamrock Management is engaged in the business of providing contract and subsidiary labor, such as electricians, mechanics, company men, tool pushers, etc., to oil-and-gas E&P companies.[9]

8.     Shamrock Energy is a holding company for Shamrock Management.  It was formed to rebrand Shamrock Management to more closely tie Shamrock Management to the energy sector as a solutions provider for oil-and-gas E&P companies.  On June 29, 2015, Shamrock Management registered the trade name "Shamrock Energy Solutions" as part of a rebranding process, such that Shamrock Management, LLC became Shamrock Management, LLC d/b/a Shamrock Energy Solutions.[10]

9.     According to the terms of a loan agreement with Jefferson Capital, which restricted the type of business ventures Shamrock Management could pursue, Shamrock Management could not engage in the oil-and-gas E&P business.  But for this restriction, Shamrock Management would have engaged in the oil-and-gas E&P business, and SIPCO would not have been formed.[11]

10.     On February 4, 2013, Trahan formed SIPCO to vet oil-and-gas E&P opportunities for acquisition and to act as a start-up E&P company.  On July 8, 2014, SIPCO was "capitalized"

---

[8] R. Doc. 109 at 4 & 12-13; Exhibit 181.
[9] R. Doc. 109 at 12; Testimony of Trahan.
[10] R. Doc. 109 at 12.
[11] Testimony of Jason Lyons (Shamrock Management and SIPCO's in-house counsel).

with a $5,000 payment from Trahan into SIPCO's separate bank account, which constitutes the sole capital contribution made to it throughout its existence.[12]

11.     SIPCO's purpose was to vet oil-and-gas E&P opportunities to help create business for Shamrock Management and to make money for Trahan. The intention was for SIPCO and Shamrock Management to work in unison, and for Shamrock Management to provide labor to SIPCO to work in the oil fields. Thus, if SIPCO had become a viable E&P company, Shamrock could have benefitted financially.[13]

12.     SIPCO shared offices and office equipment with Shamrock Management in Houma, Louisiana, and Houston, Texas. However, SIPCO did not operate out of Shamrock Management's offices in Broussard or Lafayette, Louisiana; Kennedy, Levelland, or Pecos, Texas; Wheeling, West Virginia; or North Dakota. SIPCO and Shamrock Management also have the same Houston office telephone number, which is listed in the Shamrock Management and SIPCO email account signature blocks.[14]

13.     SIPCO did not own any property and never earned any income.[15]

14.     SIPCO did not have any of its own W-2 employees.[16]

15.     Rene Breaux, III, Shamrock Management's vice president of finance and chief financial officer ("CFO"), also served as SIPCO's CFO.[17]

16.     Jason Lyons, Shamrock Management's vice president and general counsel, also served as general counsel and manager of SIPCO after it was formed.[18]

---

[12] R. Doc. 109 at 13-14; Testimony of Trahan & Rene Breaux (Shamrock Management and SIPCO's CFO).
[13] Testimony of Lyons & Trahan; Exhibits 53 & 181.
[14] R. Doc. 109 at 14.
[15] *Id*; Testimony of Trahan & Breaux.
[16] R. Doc. 109 at 13.
[17] *Id.*
[18] *Id*; Testimony of Trahan & Lyons.

17. Thus, SIPCO appointed three officers: (i) Trahan, president and CEO, (ii) Breaux, CFO, and (iii) Lyons, general counsel. Shamrock Management employed these same three persons in the exact same officer roles. However, Shanna Kornegay and Darryl Rousse were additional officers of Shamrock Management.[19]

18. Shamrock Energy had an operating agreement and articles of organization, held annual and special meetings, and prepared and filed annual meeting minutes.[20]

19. While SIPCO held annual meetings and has produced four "Actions by Unanimous Written Consent of Members in Lieu of Meeting," there is no evidence in the record that SIPCO prepared or filed annual reports, and SIPCO was deemed to be "not in good standing for failure to file Annual Report" by the Louisiana Secretary of State.[21]

20. In 2012, Shamrock Management hired Richard Sharp, an engineer. Sharp rendered services on SIPCO's behalf after it was formed in 2013. In 2013, Shamrock Management hired Luke Jensen, a geologist at an annual salary of $350,000, to vet potential oil-and-gas E&P opportunities, but he rendered these services on SIPCO's behalf after it was formed in 2013.[22]

21. While Shamrock Management had over 800 employees, the following Shamrock Management employees provided services on behalf of SIPCO, and were paid by Shamrock Management: Breaux (financial), Lyons (legal), Sharp (engineering), Jensen (geology), Clint Schexnayder (legal), Chisolm Lindsey (mechanical engineering), Russel Heim (facility engineering), Bob O'Neil (process engineering), Aarti Punase (petroleum engineering), Shanna

---

[19] Testimony of Trahan, Lyons, Breaux & Thompson.
[20] Testimony of Trahan; Exhibit 12.
[21] Testimony of Trahan & Lyons; Exhibit 11.
[22] R. Doc. 109 at 14; Testimony of Trahan.

Korneygay (administrative), Bill Bates (information technology and administrative), Gary Stansbury (business development), and Darkus Prosperie (controller).[23]

22.    SIPCO officers and Shamrock Management employees, who were rendering services on behalf of SIPCO, including Trahan, Breaux, Sharp, Lyons, and Jensen, used their Shamrock and SIPCO email addresses interchangeably when communicating internally and with third parties.[24]

23.    For example, Trahan transmitted and received emails interchangeably from both email accounts, such that both of his email addresses would sometimes appear in the same email string.  Also, Trahan would sometimes use his Shamrock Management email address for SIPCO business.[25]

24.    Similarly, Breaux and Sharp both transmitted emails from their SIPCO email addresses but continued to include their Shamrock signature block in these emails.[26]

25.    Jensen transmitted emails that contained both Shamrock and SIPCO email signature blocks, including in an email he sent to Aker.[27]

26.    SIPCO was completely financially dependent on Shamrock Management.  SIPCO did not have a separate accounting function or its own financial records.  Shamrock Management paid SIPCO's expenses and debts, which were captured within Shamrock Management's accounting system.  Shamrock Management directly paid a third-party for a SIPCO debt on at least two occasions.[28]

---

[23] R. Doc. 109 at 13-14; Testimony of Trahan & Breaux.
[24] Exhibits 16, 17, 20, 21, 23, 30, 32, 33, 37, 38, 39, 40, 41, 42, 43, 44, 46, 47, 81, 89, 94, 96, 100, 103, 138, 182 & 187.
[25] Exhibits 13, 18, 20, 22, 25, 28, 48, 50, 60, 65, 76, 77, 89 & 185.
[26] Exhibits 184.
[27] Exhibit 154.
[28] Exhibits 32, 33, 166 & 169; Testimony of Trahan & Breaux.

27.     Greenstone Equity Partners ("Greenstone") was engaged by SIPCO to help find potential investors, and Breaux told Greenstone that SIPCO was financially dependent upon Shamrock. SIPCO owed Greenstone a total of $60,000 for its services in facilitating meetings between SIPCO (Breaux and Jensen) and potential investors in the Middle East. Shamrock Management paid Greenstone for the services it provided to SIPCO.[29]

28.     On July 2, 2014, Breaux told Greenstone's Omar Algharabally that he "will not be able to wire the funds today. We are waiting on funding from Shamrock. Shamrock was supposed to receive payment from a couple of our large accounts, which would have given me some availability to move $40,000 from Shamrock to SIPCO. Unfortunately, those payments have not be[en] made as of today." On July 28, 2014, Breaux emailed Algharabally that "[t]he current activity of SIPCO is supported by Shamrock, which is related to SIPCO by common ownership."[30]

29.     On February 2, 2015, Breaux informed Greenstone that "Shamrock actually makes the payments on behalf of SIPCO, so the process is not as simple as simply cutting a check." [31]

30.     On February 4, 2015, Breaux emailed Algharabally that the payments from SIPCO for Greenstone's services were late, explaining: "SIPCO has no accounting structure because we have not yet closed a deal. We rely on Shamrock to cover SIPCO's expenses in the interim."[32]

31.     Eventually, Shamrock Management directly paid Greenstone for SIPCO's debt, one payment for $20,000 and the other for $40,000, which debt arose out of services Greenstone

---

[29] Testimony of Breaux; Exhibit 32.
[30] Exhibits 32 & 33.
[31] Testimony of Breaux; Exhibit 166.
[32] Exhibit 169.

provided to SIPCO pursuant to the contract between Greenstone and SIPCO. SIPCO never reimbursed Shamrock Management for the two payments, totaling $60,000, that Shamrock Management made to Greenstone on SIPCO's behalf.[33]

32. Shamrock Management never invoiced SIPCO for any costs it incurred on SIPCO's behalf, nor did SIPCO ever reimburse Shamrock Management for any payments or costs incurred on SIPCO's behalf. Nor did SIPCO ever reimburse Shamrock for any of the work or services that Shamrock Management employees rendered on SIPCO's behalf.[34]

33. Shamrock Management employees rendering services on behalf of SIPCO shared SIPCO's and Shamrock Management's overview presentations to potential third-party investors and financiers for SIPCO's projects. They promoted the availability to SIPCO of Shamrock Management's experience, skill sets, and E&P capabilities to convince third parties to invest in SIPCO projects. They also referred to Shamrock Energy and SIPCO as vertically integrated sister companies.[35]

34. Breaux shared Shamrock Management's 2012, 2013, and 2014 financial statements with a third-party investor that SIPCO was trying to engage.[36]

35. On August 6, 2014, Jensen emailed Ezra Beren of Platinum, subject line "Transaction Questionnaire – SIPCO," stating: "I have attached a company overview of SIPCO and our vertically integrated sister company, Shamrock Energy Solutions, which already operates and maintains deepwater platforms for IOCs. ... That should familiarize you with us as

---

[33] R. Doc. 109 at 14; Testimony of Breaux.
[34] Testimony of Trahan.
[35] Exhibits 51, 63, 83, 84, 97, 98 & 99.
[36] R. Doc. 109 at 14.

well as the experience, skills sets, and Exploration & Production capabilities we bring to the table." Trahan and Breaux both received copies of this email on August 7, 2014.[37]

36.    On September 18, 2014, Jensen emailed Jackson Kirby of Goldman Sachs, saying "we would like to progress with setting up a meeting with SIPCO senior management, including our CEO and CFO, to meet with your team and provide [you] with further background on SIPCO E&P and its sister company Shamrock Energy Solutions, our goals, and how Goldman Sachs could potentially help us achieve them in a mutually beneficial way."[38]

37.    In 2014 and, then again in 2018, Aker considered purchasing Shamrock Management and Shamrock Energy, but never considered purchasing SIPCO.[39]

## III.    AKER'S PROPOSAL FOR THE CONCEPT VALIDATION STUDY

38.    In May 2014, SIPCO was considering acquiring an oil-and-gas lease offshore in the Gulf of Mexico, known as the Trident Field, the rights to which belonged to Rocksource Exploration Norway AS ("Rocksource"). SIPCO began discussions with Rocksource to acquire the lease, but because the field had no infrastructure or producing assets of any kind located on it, SIPCO had to develop a plan to install the infrastructure to produce oil and gas before it could acquire the lease.[40]

39.    Toward that end, Sharp, on behalf of SIPCO, approached Aker about performing a concept validation study ("CVS") for the Trident Field. A CVS is conducted to understand what is required both technically and economically to develop a complex oil-and-gas facility. As a prelude to conducting the CVS, the full range of options – commonly referred to as "concepts" – are considered from a technical and economic perspective. Through this initial study (often

---

[37] Exhibit 51.
[38] Exhibit 63.
[39] Testimony of Trahan.
[40] *Id.*

referred to as a feasibility study), the options are narrowed to those that are feasible. Then a CVS is performed to validate a concept or set of concepts deemed feasible.[41]

40.     Previously, in 2011, Aker had performed a Trident Field Development Options Study (hereinafter "Feasibility Study") for Rocksource. Sharp obtained a copy of the Feasibility Study from Rocksource and provided it to Thompson when he initially approached Aker in May 2014 about performing the CVS. The purpose of the 2014 CVS was to improve upon the previous study performed for Rocksource, address any new technologies and developments, account for the price of oil and material changes, as well as, validate the initial study.[42]

41.     On June 23, 2014, Barbara Thompson, Aker's vice president of its front-end spectrum ("FES")[43] division, and Vladi Gorescu, Aker's director of projects and construction within the FES division, met with Sharp and Jensen. Sharp and Jensen asked Thompson and Gorescu to prepare a proposal and cost estimate to perform the CVS.[44]

42.     On July 3, 2014, in response to SIPCO's request, Aker emailed to Sharp its proposal for performing the CVS ("Proposal"), which contained a cost, time, and resources ("CTR") summary estimating the hours it would take to complete all facets of the CVS and discussing at length the cost breakdown for each discipline's scope of work. The initial estimated price for performing the CVS was $1,497,151 and, of that total, the estimate for labor was $1,444,771.[45]

---

[41] Testimony of Barbara Thompson (Aker's corporate representative). Thompson was laid-off from Aker due to a downturn in the oil market. Nevertheless, Aker paid for her travel, hotel, and time to serve as its corporate representative. *Id.*

[42] *Id.*; Exhibit 118.

[43] FES is an industry term/acronym used to refer to the concept development business, particularly in the offshore energy industry. Testimony of Thompson.

[44] *Id.*

[45] *Id.*; Exhibits 34 & 35.

43.     Pursuant to the CTR for "Project Management" in the Proposal, under "Scope of Work," Aker would "Chair Weekly and Monthly Meetings and Issue Minutes of Meeting" and, under "Deliverables/Activities," Aker would perform and deliver "MOM (minutes of meeting), Weekly Report, Monthly Reports, and Monthly Invoices."[46]

44.     On July 20, 2014, Sharp forwarded Aker's Proposal to Jensen requesting his feedback.[47]

45.     Thompson had authority to negotiate certain contracts in conjunction with Aker's legal team.  Thompson's supervisor was Hennig Ostvig, who led FES globally and was based in Oslo, Norway.  Ostvig worked for Aker ASA, a different Aker entity than the one for which Thompson worked, and Thompson considered the two companies to be separate.  Aker had distinct, but related, business entities in Norway and Malaysia with which Thompson worked.  If either of these related entities did work for Aker, Aker would incur intercompany charges for the work.[48]

46.     Together with another member of the Aker team on Shamrock Management business, Thompson met Trahan while he was at an Aker meeting.  At that time, Thompson learned that Trahan owned SIPCO.[49]

47.     Trahan testified that SIPCO had no way to pay for all of the vetting and research SIPCO needed.[50]

---

[46] Exhibit 35.
[47] Exhibit 34.
[48] Testimony of Thompson.
[49] *Id.*
[50] Testimony of Trahan.

## IV. SHARP'S AUTHORITY TO SIGN THE MASTER SERVICE CONTRACT

48.     When Sharp first introduced himself to Thompson he said that he worked for SIPCO as an exploration-and-development manager, and for Shamrock Management as a project manager.  Sharp had a separate business card for each entity.  The SIPCO and Shamrock Management business cards were different in color and logo.[51]

49.     Thompson testified that Sharp said SIPCO's relationship to Shamrock Management, other than having a shared ownership structure, was that "the management [of Shamrock], himself included, had formed SIPCO because they felt like they knew quite a bit about how to operate oil and gas facilities based on what they did for a living and because [Sharp] had done some of this development before at some companies like Shell, [so] they felt like they were well positioned to be able to [do] development and do their own field.  And they thought if they could make money doing the management, how much  … better … they might be suited to … actually [do] exploration and production."[52]

50.     Thompson also testified that Sharp's title as exploration-and-development manager at SIPCO, which was in his email signature and on his SIPCO business card, typically denotes a senior person having broad responsibilities related to exploration, meaning he would be the one developing this production facility, including managing drilling and other matters related to development.  In Thompson's experience, exploration-and-development managers usually have the authority to sign contracts for certain specialty services, like engineering.[53]

---

[51] Testimony of Thompson.

[52] *Id.*; *see also* Exhibit 181 (in which Jensen advises a third party that "SIPCO was founded in late 2012 somewhat naturally out of the realization that Shamrock essentially operates and maintains oil and gas fields with the same liabilities and exposures as E&P asset owners, but without the benefit of and revenue stream from production.  The SIPCO team has since been assessing and ranking E&P opportunities that fit with our strength and our business model for a profitable platform with room for strategic growth.").

[53] Testimony of Thompson.

51.     Thompson's impression of Sharp's expertise and experience in the development of oil-and-gas E&P ventures (akin to the Trident Field) was that he was knowledgeable and understood the technical engineering side of developing the asset.  Sharp had done a lot of research on new technologies Aker could provide to improve upon the initial Feasibility Study it had performed in 2011 and would be suitable for the Trident Field's deep-sea environment. Sharp worked with Aker's engineers to devise an approach to the CVS that Aker's engineers agreed was prudent.  Moreover, Sharp informed Thompson that he had worked at Shell for ten years (before working for Shamrock and SIPCO) vetting assets offshore in environments like the Trident Field.[54]

52.     On the one hand, Sharp never indicated to Thompson that he did not have the authority to sign for SIPCO the Master Service Contract ("MSC," sometimes also referred to as the Master Service Agreement or "MSA") between Aker and SIPCO.  But on the other hand, Thompson never investigated the extent of Sharp's authority, even though she knew she could not get a Dun & Bradstreet ("D&B") report on SIPCO, the company had few employees, and it was a start-up entity.[55]

53.     Sharp introduced Thompson to Trahan and explained that Trahan owned both SIPCO and Shamrock Management.  Indeed, from the outset of Thompson's interactions with Sharp and SIPCO, Sharp informed Thompson that SIPCO and Shamrock Management were related by common ownership and management.[56]

54.     Trahan testified that an Action by Unanimous Written Consent by SIPCO's officers was necessary to vest Sharp with authority to execute a document, and one does not exist

---

[54] *Id.*
[55] *Id.*
[56] *Id.*

authorizing Sharp to enter into a contract with Aker on SIPCO's behalf. Trahan further testified that Sharp knew he needed Trahan's approval before executing any agreement.[57]

55.     But after agreeing that most employers would consider Sharp's allegedly unauthorized act on SIPCO's behalf in entering into the MSC with Aker, as well as the subsequent nearly $1.8 million work order, to amount to an egregious offense worthy of termination, Trahan testified that Sharp was not terminated and continued to work for Shamrock Management and SIPCO for many more months before he resigned on his own accord.[58]

56.     At no time during their meetings about the MSC and related work order and invoices did Trahan tell Thompson he would not pay the invoices on the ground that Sharp did not have authority to enter into the MSC.[59]

## V.     THE MASTER SERVICE CONTRACT, WORK ORDER, AND CHANGE ORDER

57.     In July 2014, pursuant to the terms of Aker's Proposal, Aker and SIPCO began negotiating the MSC that would govern the CVS that Aker was to perform for SIPCO.[60]

58.     At the time, Aker knew that SIPCO, Shamrock Energy, and Shamrock Management were all separate companies. Aker attempted to access a D&B report on SIPCO, but one did not exist because SIPCO had not been around long enough; instead, Aker retrieved the D&B report on Shamrock Management. Sharp and Jensen gave Ostvig an overview of SIPCO because "SIPCO was not well-known as a company."[61]

---

[57] Testimony of Trahan.
[58] *Id.*
[59] Testimony of Thompson.
[60] *Id.*; Exhibit 44.
[61] Testimony of Thompson.

59.     On July 23, 2014, Jensen (in Sharp's stead) sent Lyons an email, having the subject line "Re: Aker MSA status (re Trident/SIPCO work)," in which he related Aker's inquiry whether SIPCO found the MSC "acceptable to at least set up the boundary conditions for future work." Lyons responded, asking: "Can you send me the MSA again please?" Jensen replied that he had a copy of Aker's "[p]roposal/scope of work document, but not the MSA itself." [62]

60.     On August 19, 2014, during the negotiation phase, Sharp stated that the MSC was being reviewed by SIPCO's legal department. [63]

61.     On September 15, 2014, Aker and SIPCO executed the MSC, which would govern the provision of certain services, goods, equipment, and facilities provided by Aker to SIPCO for the CVS. Thompson signed the MSC on Aker's behalf, and Sharp signed the MSC on SIPCO's behalf. [64]

62.     On September 29, 2014, Aker and SIPCO executed a work order under the MSC for the CVS – 2014-016-TRD ("Work Order"). The approved budget for the CVS, pursuant to the Work Order, was $1,444,771. [65]

63.     On January 13, 2015, Aker issued Change Order No. 001 ("Change Order") to increase the approved budget for the CVS being performed under the MSC and Work Order to $1,780,120. SIPCO approved and signed the Change Order on January 13, 2015. [66]

64.     The Court finds that Aker and SIPCO, through the execution of the MSC, Work Order, and Change Order, entered into a valid and legally binding contract.

---

[62] Exhibit 44.
[63] Testimony of Thompson; Exhibit 56.
[64] Testimony of Thompson; Exhibit 67.
[65] Exhibit 75.
[66] Testimony of Thompson; Exhibit 195.

## VI.  AKER'S PERFORMANCE OF THE CONCEPT VALIDATION STUDY

65.     Under the MSC, Work Order, and Change Order, Aker performed the CVS for SIPCO, and SIPCO was fully aware of Aker's progress in performing the CVS.[67]

66.     Over the course of the CVS, Aker and SIPCO held and participated in bi-weekly meetings at which Aker would distribute and make detailed presentations addressing the progress of the CVS.  These presentations allowed the parties to review and consider the activities performed during the prior two weeks and look ahead to what would be performed during the next couple of weeks.  Additionally, every discipline head would provide a report specific to the work they were performing.  After these meetings, Aker would distribute detailed minutes confirming and memorializing the progress that had been made.[68]

67.     The two primary Shamrock Management employees vetting potential oil-and-gas E&P opportunities, including the Trident Field, for SIPCO were Sharp and Jensen.  As such, Sharp and Jensen were SIPCO's two primary leads for the CVS and attended most of the Aker-SIPCO bi-weekly meetings, but, regardless of their physical attendance at the meetings, both were copied on Aker's communications about the meetings and kept current on all information about the CVS.[69]

68.      Trahan was aware of the Aker-SIPCO bi-weekly meetings.  Moreover, in 2013, 2014, and 2015, when Jensen and Sharp were pursuing projects on SIPCO's behalf, Trahan monitored their work and they routinely reported to Trahan, "sometimes . . . multiple times in a day, sometimes it was three or four times a week."  Thus, Trahan had knowledge of the CVS while it was being performed between August 2014 and February 2015.[70]

---

[67] Testimony of Thompson; Exhibit 196.
[68] *Id.*
[69] Testimony of Thompson & Trahan.
[70] Testimony of Trahan.

69. The following table lists: (i) the Aker-SIPCO bi-weekly meetings, as well as some other key meetings regarding the CVS; (ii) all SIPCO representatives who attended the meetings; and (iii) the distribution list of the individuals who received the presentation and meeting minutes for that meeting:

| DATE | MEETING | MoM DISTRIBUTION LIST | SIPCO ATTENDEES | EXHIBIT |
|---|---|---|---|---|
| 6/23/14 | Trident Development Coordination Meeting | Richard Sharp<br>Luke Jensen<br>Jess Johson<br>Russell Heim<br>Ryan Fredrik | Richard Sharp<br>Luke Jensen<br>Jess Johson<br>Russell Heim<br>Ryan Fredrik | EX. No. 196 at AKER-000003 |
| 8/20/14 | Trident Development Kick Off Meeting | Richard Sharp | Richard Sharp | EX. No. 196 at AKER-000028 |
| 9/3/14 | Bi-Weekly Meeting No. 1 | Richard Sharp<br>Luke Jensen | Richard Sharp<br>Luke Jensen | EX. No. 196 at AKER-000061 |
| 9/30/14 | Design Basis Clarification Meeting | | Richard Sharp<br>Luke Jensen | EX. No. 196 at AKER-000109 |
| 10/3/14 | Bi-Weekly Meeting No. 2 | Richard Sharp<br>Luke Jensen | Richard Sharp<br>Luke Jensen | EX. No. 196 at AKER-000123 |
| 10/30/14 | Bi-Weekly Meeting No. 3 | Richard Sharp<br>Luke Jensen | | EX No. 196 at AKER-000213 |
| 11/6/14 | Bi-Weekly Meeting No. 4 | Richard Sharp<br>Luke Jensen | Richard Sharp | EX. No. 196 at AKER-000260 |
| 11/17/14 | Scope Alignment Meeting with SIPCO | Richard Sharp<br>Luke Jensen | Richard Sharp<br>Luke Jensen | EX. No. 196 at AKER-000255 |
| 12/4/14 | Bi-Weekly Meeting No. 5 | Richard Sharp<br>Luke Jensen | Richard Sharp | EX. No. 196 at AKER-000302 |
| 1/8/15 | Bi-Weekly Meeting No. 6 | | Richard Sharp<br>Luke Jensen<br>Aarti Punase<br>Chisholm Lindsey | EX No. 196 at AKER-000515 |
| 1/22/15 | Bi-Weely Meeting No. 7 | | Richard Sharp<br>Luke Jensen<br>Aarti Punase<br>Chisholm Lindsey | EX. No. 196 at AKER-000723 |

A. ***Defendants' Knowledge of the Trident Concept Validation Study – Export Credit Norway***

70. Sharp and Jensen communicated with many potential financiers for the Trident Field project, including Export Credit Norway.[71]

71. On October 16, 2014, Sharp informed Trahan, Lyons, Jensen, Breaux, and Schexnayder about his initial video conference meeting with Export Credit Norway in mid-October 2014 and told them that "[t]he GIEK (Government Guarantor of Credit-Norway) would act as guarantor of the loan but would probably guarantee only 60-70% and we would have to provide a co-guarantor. ... This makes our life easier as we do not need to dilute as much

---

[71] Testimony of Trahan; Exhibit 94.

through PE [*i.e.,* private equity] or partner route to seek development funding" for the Trident Field project.[72]

72.     To obtain financing, SIPCO provided information to Export Credit Norway about SIPCO, Shamrock Management, the Trident Field project, and the ongoing CVS.  SIPCO referenced and utilized the ongoing CVS in its presentations to Export Credit Norway.[73]

73.     On October 21, 2014, SIPCO sent several presentations to Export Credit Norway, including: (i) a Trident Field overview ("Trident Overview"), (ii) a SIPCO/Shamrock Management overview, and (iii) a general Shamrock Management presentation.  Sharp attached SIPCO's Trident Overview presentation to an email he sent to Anna Musiej Aanensen of Export Credit Norway on October 21, 2014, copying Jensen.  In the email, Sharp says "I have shared the information you provided during our call to our CFO and we see the path proposed as the ideal solution.  We do not view the provision of a bank guarantee in conjunction with whatever is provided by GIEK as an insurmountable hurdle."[74]

74.     In SIPCO's Trident Overview presentation sent to Export Credit Norway, SIPCO included a slide entitled "Summary: Third Party Trident Concept Studies," which referenced "Aker Solutions: Cost & feasibility study for the four different development alternatives, covering subsea and surface facilities," with a bullet point stating: "Technical feasibility declared and no major technology development required for project delivery."  This is a reference to Aker's CVS that was ongoing in October 2014.[75]

---

[72] Exhibit 94.  GIEK is a Norwegian acronym for Export Credit Norway
[73] Exhibits 97-99.
[74] *Id.*
[75] Exhibit 99 (slide bearing bates no. SES-016831); Testimony of Trahan.

75.     As of October 2014, Trahan knew (including through routine conversations with Sharp and Jensen) that the Trident Field project was "technically feasible," which was why SIPCO was pursuing the asset.[76]

76.     In SIPCO's Trident Overview presentation sent to Export Credit Norway, SIPCO also included a slide entitled "Development Concepts CAPEX and OPEX," which identified the "Aker Concept Study" and listed four case studies outlining different general infrastructure concepts being considered by SIPCO in the CVS for the Trident Field project: a subsea option; a FPU (floating production unit) option; a SPAR (single point anchor reservoir) option; and an FPSO (floating production, storage, and offloading vessel) option.  SIPCO also provided details about the costs of the associated facilities and operations related to the four concepts.[77]

77.     In SIPCO's Trident Overview presentation sent to Export Credit Norway, SIPCO also included a slide entitled "Development Activities Working," which stated in part: "Concept Validation Study underway to confirm pricing and delivery of Trident Development."[78]

78.     Trahan assumes he saw, during the October/November 2014 timeframe, the Trident Overview presentation explicitly referencing the Aker CVS.  In fact, Trahan believes that Jensen presented the Trident Overview at a meeting he attended with Aker and Export Credit Norway in Norway on November 15-16, 2014.[79]

79.     Trahan testified that it "appears" that Sharp was openly sharing the CVS that Aker was performing with third parties.[80]

[76] Testimony of Trahan.
[77] Exhibit 99 (slide bearing bates no. SES-016838); Testimony of Trahan.
[78] Exhibit 99 (slide bearing bates no. SES-016841).
[79] Testimony of Trahan; Exhibit 99.
[80] Testimony of Trahan.

### B. *Defendants' Knowledge of the Trident Concept Validation Study - November 2014 Aker-SIPCO Meeting in Norway*

80.     On November 10, 2014, Christian Johnsud of Aker sent Jensen an email outlining an agenda for a "SIPCO-Aker Meeting" (the subject line of the email) to occur in Oslo, Norway, on November 15-16, 2014.  The agenda included the following items: "15.00 – Alignment of project timeline vs Aker activities (VC AKER Houston)," with a bullet point reciting: "High level status of pre-feed, Additional activities needed."[81]

81.     Also, on November 10, 2014, Jensen shared Johnsud's proposed agenda with Trahan, Breaux, Lyons, and Sharp.[82]

82.     That same day, Sharp circulated to Trahan, Lyons, Breaux, and Jensen a copy of the Feasibility Study that Aker performed on behalf of Rocksource in 2011.  Sharp's cover email transmitting the 2011 Trident study states: "See attached……includes economics."[83]

83.     Trahan testified that Sharp's reference to the 2011 Feasibility Study "includ[ing] economics" relates to pricing information concerning the feasibility of the Trident concept options and that the 2011 Feasibility Study appears to include the cost estimates for the concepts originally proposed to Rocksource in millions of dollars.[84]

84.     In conjunction with Aker's efforts to help SIPCO find financing, Aker introduced SIPCO to the Export Credit Bank and Export Credit Norway.  On November 15-16, 2014, Trahan, Breaux, Lyons, and Jensen, participated in a meeting with Export Credit Norway and Aker in Norway.  Trahan testified that he would "suspect" Shamrock Management paid for him,

---

[81] Exhibit 107.
[82] Exhibit 114.
[83] Exhibit 118.
[84] Testimony of Trahan.

as well as Breaux, Lyons, and Jensen to travel to Oslo, Norway, to attend the November 15-16, 2014 meeting, including their lodging expenses.[85]

85.     At the meeting, Aker and SIPCO discussed the ongoing CVS as one of the Trident Field project-related tasks, additions/expansions to the CVS, and the need to "freeze" the concept so Aker could move forward with critical long-lead items.[86]

86.     Thompson and Gorescu called into the meeting from Houston, Texas, and discussed the status of the CVS, specifically with regards to what had been accomplished and what was forecasted to be completed.  During their presentation, which lasted approximately thirty minutes to an hour, no SIPCO representative expressed any surprise, lack of knowledge, or concern (i) about the CVS or (ii) that SIPCO had entered into a contract with Aker.  By mid-November 2014, Aker had been working on the CVS for approximately two-and-a-half to three months at a minimum.[87]

87.     During the meeting, Jensen gave a presentation outlining the difference between SIPCO and Shamrock Management.  Jensen stated that SIPCO was formed to vet oil-and-gas E&P opportunities and was looking for financing.  Thompson was not present via telephone when the presentation about the difference between Shamrock Management and SIPCO was made, or when the possibility of Export Credit Bank's financing SIPCO was discussed.[88]

88.     Aker memorialized the discussions at the November 15-16, 2014 meeting in minutes having the subject line: "Sipco & Aker Solutions meeting – Trident field development."

---

[85] Testimony of Trahan & Lyons.
[86] Testimony of Thompson; Exhibit 124.
[87] Testimony of Thompson & Trahan.
[88] Testimony of Thompson & Lyons; Exhibit 124.

On December 1, 2014, Aker circulated the meeting minutes by email to the SIPCO attendees – Trahan, Breaux, Jensen, Lyons, and Sharp.[89]

89.     Trahan testified that the following statement in the meeting minutes, "FES team in Houston participated via VC [*i.e.,* videoconference] to discuss high level plan and stakeholder committee," is a reference to Aker's front-end spectrum team that was performing the CVS in Houston.[90]

90.     The minutes state that "Aker agreed to provide a high level cost estimate for a typical 75', 100' & 125' barrel per day topside facility to support Sipco in their economic evaluation of topside capacity vs # off field location to tie-in.  Potential for topside concept with modular expansion should also be addressed at high level."  The minutes further reflect that "Aker flagged the need to freeze the concept/specifications to move forward with critical long lead items."  This was especially important because of SIPCO's desire to hasten the CVS (the pre-FEED stage) to get to the FEED (front-end engineering design) stage.  The request to "freeze the concept" is referring to the need to freeze the concepts and specifications being studied from a design standpoint, especially for items that "require serious engineering calculations."  Further, one of the "actions" listed at the end of the minutes states: "Review team of ongoing Study work. Aker."[91]

91.     Trahan testified that the meeting minutes were accurate, that Jensen "played a part in drafting these minutes of meeting," and that if something was "inaccurately described in these minutes of meeting he could have objected and requested that it be changed."[92]

---

[89] Exhibits 123 & 124.
[90] Testimony of Trahan; Exhibit 124.
[91] Testimony of Thompson; Exhibit 124.
[92] Testimony of Trahan.

92.     In the cover email circulating the minutes, Johnsud stated that "[o]ne comment from Sipco related to the [minutes] is that many of th[ese] issues [are] currently being addressed (e.g. required base case production handling/storage capacities, long lead items, fluid compatibilities/separation, etc.)."  Trahan testified that Johnsud's statement meant that Aker and SIPCO were already tending to many of the issues discussed in the meeting minutes and that he assumed the references to "addressing long lead items . . . relate[d] to the concept validation study."[93]

93.     Jensen, who was present at the November 15-16, 2014 meeting with Trahan, was informed about the CVS through his participation in the bi-weekly meetings pertaining to the CVS.  At the time of the meeting in Norway, Trahan was aware Jensen attended the bi-weekly meetings concerning the CVS and knew about the work Aker was performing to validate the Trident Field concepts.[94]

94.     Accordingly, the Court finds that SIPCO and Trahan, through his regular meetings with Jensen and Sharp, were fully aware of the CVS Aker was performing, as well as the effort required to perform the work.  The Court also finds that Trahan's testimony that he had no knowledge of the CVS Aker was performing is not credible.  The Court further finds that Trahan's testimony that he did not understand what was involved in performing the CVS is not credible.  And the Court finds that Breaux's testimony that he had no knowledge of the CVS Aker was performing is not credible.

**C.  *Trahan Knew and Understood the Cost to Perform the Concept Validation Study***

95.     Trahan testified that it is an inherently expensive and risky endeavor to engage in oil-and-gas exploration.  Such a venture requires a lot of research and specialized knowledge to

---

[93] *Id.*; Exhibit 123.
[94] Testimony of Thompson & Trahan.

find a lease that will produce, to find an economical way to get the oil and gas to market so that the lease will be profitable, and to gain an accurate understanding of the estimated oil-and-gas reserves. Moreover, to be an oil-and-gas producing company in the Gulf of Mexico especially, one must understand the infrastructure required to get the oil and gas to market, including what type of production facilities are best suited for the environment given the water depth and how one will moor the facilities to the seabed. Also, among the high-level issues that need to be understood if one is engaging in E&P work in the Gulf of Mexico, such as the Trident Field project, one needs to know whether risers, flow lines, new pipelines, or other subsea equipment will be required. Potential investors are not going to invest in an E&P project, like the Trident Field, unless there is a viable concept plan in place that provides some reasonable degree of certainty that the project will be a success. The time, effort, research, and vetting of a potential oil-and-gas project is expensive and often requires hiring third parties to perform studies to address high-level issues posed by the project. Trahan testified that he understands that a concept validation is a cost estimate.[95]

96. Trahan demonstrated that he understood fully the significant effort and costs required to perform and produce the CVS, which would be required to obtain financing for the Trident Field project. Trahan testified that he understands that such work is time consuming and expensive. Accordingly, the Court finds that Trahan's testimony that he had no knowledge of the CVS and that he believed Aker was performing the work on the CVS for free is not credible.

## VII.   SIPCO'S FAILURE TO PAY AKER FOR THE CONCEPT VALIDATION STUDY

97. Aker performed the CVS between August 2014 and February 2015.[96]

---

[95] Testimony of Trahan.
[96] Testimony of Trahan; Exhibits 116 & 147.

98.     Pursuant to section 7 of the MSC, Aker was obligated to bill SIPCO monthly for the CVS, and SIPCO was obligated to pay within forty-five (45) days of receiving the monthly invoice or to dispute the invoice within thirty (30) days of its receipt.[97]

99.     There is no contingency in the MSC or Work Order whereby Aker would get paid only if SIPCO acquired an oil-and-gas producing asset or obtained financing for the Trident Field project.[98]

100.    In connection with its performance of the CVS, Aker maintained time sheets detailing the work that was being performed.  These time sheets were included with the monthly invoices that Aker sent to SIPCO.  At no time did SIPCO request that Aker stop or suspend work.[99]

101.    Specifically, Aker submitted four invoices to SIPCO, including:

   a.    Invoice No. 917023043, dated November 10, 2014, for the CVS work Aker performed during the period from August to October of 2014, in the amount of $478,829.89;[100]

   b.    Invoice No. 917023670, dated December 12, 2014, for the CVS work Aker performed during November 2014, in the amount of $554,928.70;[101]

   c.    Invoice No. 917023846, dated January 20, 2015, for the CVS work Aker performed during December 2014, in the amount of $351,417.48;[102] and

   d.    Invoice No. 917024077, dated March 20, 2015, for the remaining CVS work Aker performed, in the amount of $394,968.12.[103]

---

[97] Exhibits 67 (at bates no. AKER-014989), 116, 131, 159 & 176.
[98] *Id.*; Testimony of Thompson.
[99] Testimony of Thompson; Exhibits 117, 132 & 160.
[100] R. Doc. 109 at 15; Exhibit 116.
[101] R. Doc. 109 at 15; Exhibit 131.
[102] R. Doc. 109 at 15; Exhibit 159.
[103] R. Doc. 109 at 15; Exhibit 176.

102.     Aker's invoices total $1,780,144.19.  In May 2015, Breaux received and acknowledged receipt of Aker's invoices related to the CVS.[104]

103.     SIPCO has not paid any of the invoices that Aker issued for the CVS.  SIPCO did not comply with its obligation to pay Aker within 45 days of receiving any of the four invoices; nor did SIPCO dispute any portion of the four invoices within the applicable 30-day period.[105]

104.     Aker fully and completely performed the CVS in a satisfactory and timely manner.  Neither Trahan nor SIPCO disputed the CVS work Aker performed.[106]

105.     Aker fully and completely created all supporting documentation for the final report, including all drawings, calculations, cost estimates, schedules, diagrams, and computer outputs.  This information and documentation had been relayed to SIPCO throughout the course of the performance of the CVS and the Aker-SIPCO meetings.[107]

## VIII.     AKER'S REPEATED DEMANDS FOR PAYMENT FROM SIPCO

106.     Aker repeatedly made demands to SIPCO for the payment of its invoices.[108]

107.     In fact, the demands for payment had become so frequent by January 9, 2015, that Thompson sent an email to Sharp with the subject line "Consider this my daily nag…..", wherein she requested payment for the invoices.  This email, like the previous demands for payment, was to no avail.[109]

108.     SIPCO repeatedly assured Aker that it would pay the outstanding invoices.[110]

109.     In January 2015, despite not having paid any of the outstanding invoices, SIPCO attempted to obtain a bridge financing loan from Aker to acquire the Trident Field lease.  Aker

---

[104] R. Doc. 109 at 15; Testimony of Trahan.
[105] Testimony of Thompson.
[106] *Id.*
[107] *Id.*; Exhibit 197.
[108] *Id.*
[109] Exhibit 149.
[110] Exhibits 148, 151, 156, 162, 163, 164 &167.

responded to SIPCO that any bridge financing from Aker was contingent on receiving payment for the unpaid invoices.[111]

110.    For example, on January 23, 2015, in response to Jensen's question about the possibility of obtaining bridge financing from Aker for the Trident Field acquisition, Aker's Neil Holder wrote, "As a reminder, payment for our on-going work is a prerequisite for us being able to consider any future work, and in particular financing.  As of now, we are yet to receive the payments already due, despite various assurances that we would be paid this week.  Please ensure all outstanding amounts are paid in full by Monday."[112]

111.    Despite Jensen's subsequent response to Holder assuring Holder that "[p]ayment is on the way as discussed, it should be received on Monday so that aspect of the process should be resolved," and his assurance to Thompson that SIPCO will provide proof that the payments have been made via a transmittal document from SIPCO's bank, Aker did not receive any funds from SIPCO for the Aker invoices.[113]

112.    On March 23, 2015, Thompson sent Sharp the "complete bill," attaching the last invoice for the Aker work performed in January and February 2015.  On March 26, 2015, Thompson and Sharp had a meeting to discuss the payments due to Aker.[114]

## IX.    RATIFICATION OF AKER'S WORK & INVOICES

113.    Trahan and Thompson had several conversations and meetings regarding the Work Order for the CVS, during which they discussed the CVS, Sharp's execution of the Work

---

[111] Exhibits 155 & 161.
[112] Exhibit 161.
[113] *Id.*
[114] Exhibit 177.

Order, Aker's invoices for the CVS, and how Aker's work would eventually be compensated and applied. Thompson expected that SIPCO, not a related entity, would pay the invoices.[115]

114. In April 2015, after numerous demands for payment to SIPCO through Sharp, Thompson decided to call Trahan personally. Following this phone call, also in April 2015, Thompson and Trahan met at Shamrock's Lafayette office to discuss the invoices and what Trahan would do to get them paid. Trahan indicated that he would put them at the top of the vendor list and that "he generally wanted to get them paid but indicated that he didn't know how he was going to get it done [because] SIPCO didn't have the money." [116]

115. Breaux also assured Thompson that SIPCO would pay Aker for the outstanding invoices at Trahan's direction. Specifically, in a letter to Thompson dated May 11, 2015, Breaux wrote: "We are providing this correspondence in regards to the current outstanding invoices [from] Aker Solutions to SIPCO as discussed in your previous conversations with Jeff Trahan. It is the intention of SIPCO to place the Aker invoices at the top of the vendor list for payment once … one of the … SIPCO transactions come to fruition. … We are looking forward to continuing and growing our business relationship with Aker Solutions in the very near future."[117]

116. While discussing Breaux's May 11, 2015 letter to Aker regarding the invoices, Trahan testified that "[i]f we would have received funding or positive feedback from Ecopetraol, we would have needed any work that was performed by Aker and, therefore, there was no reason to dispute it." Yet, Trahan testified that neither the payment provisions of the MSC nor Aker's invoices were contingent upon some future financing arrangement or business venture.[118]

---

[115] R. Doc. 109 at 15; Testimony of Thompson.
[116] Testimony of Thompson.
[117] Testimony of Breaux; Exhibit 178.
[118] Testimony of Trahan.

117.     Thompson and Trahan had another meeting in late September or early October 2015, during which Trahan repeated his intention to pay the invoices.[119]

118.     In October 2015, Trahan called Thompson and assured her that "he was trying to get together enough money as a good faith effort to pay [Aker] at least [$]500,000" of the total cost of the invoices by the end of 2015 and that he would send a letter by November 6, 2015, confirming this assurance of payment in writing.[120]

119.     On October 27, 2015, Thompson sent Trahan an email asking him "to confirm that you will send a letter by November 6th stating that you will be able to pay $500K towards our invoices by the end of the year."  In response, on November 6, 2015, Trahan emailed Aker's Svenn Ivar that he "should have more information to convey in the later part of the next week."[121]

120.     Then, on November 19, 2015, and again on December 10, 2015, Ivar emailed Trahan requesting information on SIPCO's status of paying Aker for the unpaid invoices.  On December 14, 2015, Trahan responded (from his Shamrock email account) to Ivar's email that he still did not have any good news to report but "we still have interest in moving forward."  On December 20, 2015, Ivar replied to Trahan that Aker will resend the invoice to Trahan at the end of the year.[122]

121.     Despite these assurances from Trahan and Breaux, Aker's invoices related to the CVS were never paid.[123]

---

[119] Testimony of Thompson.
[120] Id.
[121] Exhibit 185.
[122] Id.
[123] R. Doc. 109 at 15.

122.    Neither Trahan nor Breaux ever represented that SIPCO would not pay Aker's invoices because Sharp had no authority to enter into a contract.[124]

123.    Given SIPCO's failure to pay the invoices, Aker decided to withhold the final Trident Concept Validation Study because it was the only mitigating activity that Aker could implement.[125]

124.    Neither Trahan nor Breaux ever told Aker that SIPCO would not pay the invoices because they disputed the work, because Aker's performance was defective or poor, or because they did not receive a final report.[126]

125.    Until this lawsuit was filed, no SIPCO or Shamrock Management officer ever disputed the Aker invoices related to the CVS despite numerous opportunities to do so.  Lyons was not asked to dispute Aker's invoices although part of his job as general counsel for Shamrock and SIPCO was to be involved in claims and disputes.  Lyons testified that he was not engaged by SIPCO or Trahan to dispute the invoices or help communicate with Aker with respect to either Breaux's May 11, 2015 letter or the email exchange during October-December 2015 timeframe (which included Thompson's October 27, 2015 email to Trahan).[127]

## X.    SIPCO'S DISSOLUTION

126.    On November 1, 2015, Breaux entered into a contract on behalf of both SIPCO and Shamrock Management for SIPCO to reimburse Shamrock Management for certain expenses it incurred on behalf of SIPCO, retroactive to January 1, 2015.  There is no similar

---

[124] Testimony of Thompson & Breaux.
[125] Testimony of Thompson; Exhibit 171.
[126] Testimony of Trahan, Thompson & Breaux.
[127] Testimony of Lyons.

agreement for expenses Shamrock Management incurred on SIPCO's behalf prior to January 1, 2015.[128]

127.    The agreement between Shamrock Management and SIPCO was executed because, at that time, Trahan had entered into a non-binding agreement with Reignwood for Reignwood to purchase SIPCO.    Thus, the purpose of the Shamrock Management/SIPCO agreement was to have SIPCO reimburse Shamrock Management for expenses incurred on SIPCO's behalf once Reignwood acquired SIPCO.[129]

128.    Reignwood never acquired SIPCO.    Thereafter, SIPCO became inactive, and Sharp resigned from Shamrock near the end of 2015.[130]

129.    SIPCO never reimbursed Shamrock Management for any costs or expenses it incurred on SIPCO's behalf.

130.    Neither SIPCO nor Shamrock Management ever executed a binding agreement with any financier related to the Trident Field project.[131]

131.    Near the end of 2015, Jensen resigned from Shamrock Management after Trahan told Jensen that he wanted to go in a different business direction.[132]

132.    On February 1, 2016, a petition for liquidation and dissolution on behalf of SIPCO was filed with the clerk of court for the Parish of Terrebonne, State of Louisiana.[133]

---

[128] R. Doc. 109 at 15; Exhibit 186; Testimony of Trahan.
[129] R. Doc. 109 at 15.
[130] *Id.* at 15-16.
[131] *Id.* at 16.
[132] *Id.*
[133] *Id.*; Exhibit 189.

**CONCLUSIONS OF LAW**

I. <u>J</u><u>URISDICTION AND</u> <u>V</u><u>ENUE</u>

1.      This Court has diversity subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

2.      Pursuant to 28 U.S.C. § 1391(1) and (2), venue is proper in this Court because all the Defendants reside, and a substantial part of the events giving rise to Aker's claims occurred, within this judicial district.

II. <u>B</u><u>REACH OF</u> <u>C</u><u>ONTRACT</u>

3.      Aker contends that SIPCO has breached the contract (the MSC, Work Order, and Change Order) they entered.  To succeed on a breach-of-contract claim under Louisiana law, a plaintiff must prove: "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Favrot v. Favrot*, 68 So. 3d 1099, 1108-09 (La. App. 2011).  Under Louisiana Civil Code article 1994, "[a]n obligor is liable for the damages caused by his failure to perform a conventional obligation.  A failure to perform results from nonperformance, defective performance, or delay in performance."  La. Civ. Code art. 1994.  "A failure to pay money due under a contract is a failure to perform in the context of La. Civ. Code Art. 1994." *Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*, 494 F. Supp. 2d 401, 416 (M.D. La. 2007) (citing *Whitney Nat'l Bank of New Orleans v. Poydras*, 557 So. 2d 422, 425-26 (La. App. 1990)).

4.      Defendants dispute whether a contract ever existed between SIPCO and Aker regarding the CVS.  "A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished."  La. Civ. Code art. 1906.  Under Louisiana law, the

32

formation of a valid contract requires: (1) capacity to contract; (2) mutual consent; (3) a certain object; and (4) a lawful cause. *Id.* arts. 1918, 1927, 1966 and 1971. "The burden of proof in an action for breach of contract is on the party claiming rights under the contract." *Rebouche v. Harvey*, 805 So. 2d 332, 334 (La. App. 2001) (citation omitted). "The existence of the contract and its terms must be proved by a preponderance of the evidence." *Id.* Moreover, "[t]he existence or nonexistence of a contract is a question of fact and, accordingly, the determination of the existence of a contract is a finding of fact." *Sam Staub Enters., Inc. v. Chapital*, 88 So. 3d 690, 693 (La. App. 2012) (citation omitted).

5.  The MSC, Work Order, and Change Order between Aker and SIPCO had a certain object that was a lawful cause – namely, for Aker to perform the CVS of the Trident Field and for SIPCO to pay for that study in the amount of $1,780,144.19 as consideration for the services rendered by Aker. And it is undisputed that both Aker and SIPCO had the capacity to enter into a contract. Defendants dispute, however, that there was mutual consent, contending that Sharp did not have authority to enter into the contract on SIPCO's behalf.

6.  Under Louisiana law, an agent's authority is composed of actual authority, expressed or implied, and any apparent authority which the principal has invested in him by its conduct. *Jefferson Parish Hosp. Serv. Dist. No. 2 v. K & W Diners, LLC*, 65 So. 3d 662, 668 (La. App. 2011) (citing *Boulos v. Morrison,* 503 So. 2d 1, 3 (La. 1987)).

7.  "As between principal and agent the limit of the agent's authority to bind the principal is governed by the agent's actual authority. As between the principal and third persons, the limit of an agent's authority to bind the principal is governed by his apparent authority. ... Apparent authority is a judicially created concept of estoppel which operates in favor of a third party seeking to bind a principal for the unauthorized act of an apparent agent." *Boulos*, 503 So.

2d at 3 (citing *Broadway v. All-Star Ins. Corp.*, 285 So. 2d 536 (La. 1973); *Interstate Elec. Co. v. Frank Adam Elec. Co.*, 136 So. 283 (La. 1931)).

8.     "Apparent authority is created as to a third person by conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him.   Apparent authority is distinguished from actual authority because it is the manifestation of the principal to the third person rather than to the agent that is controlling." *Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985) (citing RESTATEMENT (SECOND) OF AGENCY § 27).  Thus, for apparent authority to apply under Louisiana law, "the principal must first act to manifest the alleged mandatary's authority to an innocent third party.  Then, the third party must reasonably rely on the mandatary's manifested authority." *Jefferson Parish Hosp. Serv. Dist. No. 2*, 65 So. 3d at 668 (citing *Boulos*, 503 So. 2d at 3).

9.     If the agent had neither actual, nor implied, nor apparent authority, the principal may still be bound to contracts made by an agent with a third party if the principal ratifies the agent's unauthorized acts.  La. Civ. Code art. 1843 ("Ratification is a declaration whereby a person gives his consent to an obligation incurred on his behalf by another without authority."); *see also* RESTATEMENT (THIRD) OF AGENCY § 4.01.  "A ratification is not effective unless it encompasses the entirety of an act, contract, or other single transaction." RESTATEMENT (THIRD) OF AGENCY § 4.07.  Louisiana law provides that implied or tacit ratification occurs when "the principal, knowing of the contract, does not repudiate it but accepts its benefits." *Bamber Contractors, Inc. v. Morrison Eng'g & Contracting Co.,* 385 So. 2d 327, 331 (La. App. 1980); La. Civ. Code art. 1843.  The party asserting ratification must prove that the principal clearly intended to ratify the act. *Bamber Contractors,* 385 So. 2d at 331.

10. Although Trahan testified that Sharp did not have actual authority to bind SIPCO to the MSC with Aker, Sharp clearly had apparent authority to do so. Sharp approached Aker to discuss the CVS and told Thompson that he was SIPCO's exploration-and-development manager. In Thompson's many years of experience in the oil-and-gas E&P industry, a company representative with such a title typically is in senior management and responsible for the development of the production facility and has the authority to sign contracts for certain specialty services, like engineering. Sharp provided Thompson with the Rocksource Feasibility Study for the Trident Field stating that the CVS was intended to improve upon and validate that study. Thompson thought Sharp was knowledgeable in the technical engineering part of developing the asset because he had worked for Shell for ten years vetting offshore assets, did a lot of research on new technologies, and worked with Aker's engineers to devise an approach to the CVS. Sharp's indicia of expertise and experience in the relevant area manifested to Thompson his apparent authority to bind SIPCO to contracts for engineering services.

11. Further, throughout all their dealings, SIPCO did not do anything to dispel Aker's assumption that Sharp had such authority. For example, Lyons was aware that Sharp was negotiating the CVS but did not contact Aker to say that Sharp did not have authority to enter into the contract on SIPCO's behalf or to request any changes to the contract.

12. Aker's reliance on Sharp's authority to act on behalf of SIPCO was reasonable.

13. Even if Sharp did not have apparent authority, SIPCO ratified the MSC on many occasions. SIPCO's three officers, Trahan, Lyons, and Breaux, all had knowledge of the MSC and did not do or say anything to repudiate the MSC, Work Order, Change Order, Aker's invoices, or Aker's performance of the CVS. Trahan and Breaux's repeated assurances of payment to Aker, as well as Trahan's statements to Aker wherein he expressed an intention and a

desire to accept the benefits of the CVS, evince SIPCO's ratification of Sharp's execution of the MSC, Work Order, and Change Order on SIPCO's behalf.

14.     Accordingly, the Court finds that Sharp had apparent authority to enter into the MSC on SIPCO's behalf; but even if he did not, Trahan and others acting on SIPCO's behalf ratified Sharp's entering into the MSC, Work Order, and Change Order, and, as such, SIPCO is bound for its debts to Aker.  The Court further finds that SIPCO's ratification is retroactive to September 15, 2014, the date of the ratified obligation.  *See* La. Civ. Code art. 1844.

15.     The evidence shows that Aker fully and completely performed all work in a timely manner in accordance with the terms of the MSC, Work Order, and Change Order, which included holding bi-weekly meetings with SIPCO's representatives to discuss the progress of the CVS.  SIPCO's liability to pay Aker for its work was not contingent on any future financing arrangement for SIPCO or any future business deal.

16.     SIPCO did not pay Aker for the work it performed on the CVS, and Aker was damaged by SIPCO's failure to pay the $1,780,144.19 invoiced.

17.     Thus, SIPCO breached the contract between it and Aker, which has resulted in damages to Aker in the amount of $1,780,144.19, plus pre- and post-judgment interest, attorney's fees, and court costs.[134]

## III.     ALTER EGO THEORY

18.     Aker contends that Trahan is personally liable for SIPCO's debt to it under the alter ego theory.

---

[134] Exhibit 67 (at bates no. AKER-014996).  Defendants argue that Aker's damages should be reduced because it failed to mitigate by stopping work on the CVS when its first few invoices were not paid.  At that time, Aker was helping SIPCO find financing and SIPCO's representatives were assuring Aker that it would eventually be paid for its work.  Aker had no reason to believe otherwise, and thus, had no reason to stop work to mitigate its damages.

19.    Generally, in Louisiana "corporations are distinct legal entities, separate from the individuals who comprise them, and … the shareholders are not liable for the debts of the corporation."    *Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164, 1167 (La. 1991) (citations omitted).    However, a "court may ignore the corporate fiction and hold the individual shareholders liable … where the corporation is found to be simply the 'alter ego' of the shareholder," which "usually involves situations where fraud or deceit has been practiced by the shareholder acting through the corporation."    *Id.* at 1168 (citations omitted).

20.    Louisiana courts have determined that the same veil-piercing requirements regarding corporations also apply to limited liability companies.    *ORX Res., Inc. v. MBW Expl., L.L.C.*, 32 So. 3d 931, 935 (La. App. 2010) (court can pierce corporate veil of LLC under alter ego doctrine); *Prasad v. Bullard*, 51 So. 3d 35, 40 (La. App. 2010) (court can pierce corporate veil to reach the alter ego of company member and hold company member liable for debts of LLC).    Under Louisiana law, the veil of protection afforded by the limited liability company form may be pierced if in fact the limited liability company was operating as the alter ego of its members or if its members were committing fraud or deceit on third parties.    *Hollowell v. Orleans Reg'l Hosp.*, 1998 WL 283298, at *10 (E.D. La. May 29, 1998), *aff'd*, 217 F.3d 379 (5th Cir. 2000).

21.    Aker is seeking to pierce SIPCO's corporate veil to impose liability upon Trahan in SIPCO's stead under an alter ego theory, but not a theory of fraud.

22.    "The alter ego doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases.    The doctrine applies only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used

to commit a fraud or wrong that injured the party seeking to pierce the veil." *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 447 F.3d 411, 414 (5th Cir. 2006) (quotation marks and citations omitted).

23.     To prove alter ego liability, a plaintiff must "prove that the shareholders [or members] disregarded the corporate entity to such an extent that it ceased to become distinguishable from themselves." *Medve Energy Ventures LLC v. Warhorse Oil & Gas LLC*, 2018 WL 7051038, at *6 (W.D. La. Nov. 21, 2018) (quotation marks and citation omitted); *see also Riggins*, 590 So. 2d at 1168. In determining whether to apply the alter ego theory and pierce the veil, courts consider evidence of: "1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings." *Riggins*, 590 So. 2d at 1168. The foregoing list is illustrative, not exclusive, and a court must consider the totality of the circumstances when deciding whether to pierce the corporate veil. *Id.* at 1168-69.

24.     The Court finds that, under the totality of the circumstances, piercing the corporate veil to impose liability upon Trahan under the alter ego theory is not warranted. The evidence shows that Trahan did not have exclusive control over SIPCO's contract with Aker. SIPCO's other officers, Breaux and Lyons, were also aware of the contract, with Breaux assuring Aker that the invoices would be paid by SIPCO. Further, Sharp and Jensen were SIPCO's point-persons on the CVS. Thus, Trahan did not exercise exclusive control over the MSC, Work Order, and Change Order in connection with any damage to Aker resulting from this transaction.

25.     With respect to the *Riggins* factors, the only one that is arguably satisfied as to Trahan is undercapitalization. Trahan testified that SIPCO had a separate bank account into which he deposited $5,000 when SIPCO was formed. And there is no evidence that Trahan

comingled his personal funds with those of SIPCO. While SIPCO's record of following corporate formalities is mixed, there is no indication that Trahan treated SIPCO as a mere personal instrumentality. As for undercapitalization, Trahan testified that $5,000 was an adequate initial investment for SIPCO because it was only vetting oil-and-gas E&P opportunities. But Trahan also testified he knew the type of research needed to properly vet such opportunities is expensive. The expense is evident by SIPCO's large debt to Aker. Therefore, SIPCO was undercapitalized. However, such undercapitalization, when considered in the totality of the circumstances, is insufficient to apply the alter ego theory to hold Trahan personally responsible for SIPCO's debt to Aker.

## IV.    SINGLE BUSINESS ENTERPRISE THEORY

26.    Aker contends that Shamrock Management is liable for SIPCO's debt to it under the single-business-enterprise theory.

27.    The single-business-enterprise doctrine is "a theory for imposing liability where two or more business entities act as one." *Brown v. ANA Ins. Grp.*, 994 So. 2d 1265, 1266 n.2 (La. 2008) (citing *Green v. Champion Ins. Co.*, 577 So. 2d 249 (La. App. 1991)). Generally, under this doctrine, "[w]hen corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose." *Id*.

28.    When the single-business-enterprise theory applies, a court can disregard the legal fiction of distinct corporate entities "when a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another corporation." *Green*, 577 So. 2d at 257. "If one corporation is wholly under the control of another, the fact that it is a separate entity does

not relieve the latter from liability," because "the former corporation is merely an alter ego or business conduit of the latter." *Id.* (citation omitted).

29.    Courts examine the substance, rather than the form, of the corporate structure in determining whether one entity is an instrumentality or alter ego of another. *Id.* The following eighteen factors are considered: identity or substantial identity of stock ownership (*i.e.*, ownership of sufficient stock to give actual working control); common directors or officers; unified administrative control of entities whose business functions are similar or supplementary; directors and officers of one corporation act independently in the interest of that corporation; corporation financing another corporation or asset commingling; inadequate capitalization; one corporation causing the incorporation of another affiliated corporation; one corporation paying the salaries and other expenses or losses of another corporation; receiving no business other than that given to it by its affiliated corporations; one corporation using the property of another corporation as its own; noncompliance with corporate formalities; common employees; services rendered by the employees of one corporation on behalf of another corporation; common offices; centralized accounting; undocumented transfers of funds between corporations; unclear allocation of profits and losses between corporations; and excessive fragmentation of a single enterprise into separate corporations. *Id.* at 257-58; *see also Rive v. Briggs of Cancun, Inc.*, 82 F. App'x 359, 366-67 (5th Cir. 2003) (restating and applying *Green*'s eighteen-factor test). The foregoing "list is illustrative," and not intended to be exhaustive; nor is any one factor dispositive. *Id.* at 258. A court must consider the "totality of the circumstances" in each case to discern if the companies are being operated as a single entity. *Bona Fide Demolition & Recovery, LLC v. Crosby Constr. Co. of La., Inc.*, 690 F. Supp. 2d 435, 444 (E.D. La. 2010).

30.     Louisiana courts have held that where there is evidence of common management and ownership, and the companies are perceived as linked by one company referring to itself as a "sister company" to another which provided complementary business functions, these factors show a disregard for the corporate separateness of the entities and, as such, are considered a single business enterprise. *Hollowell,* 217 F.3d at 389-90.

31.     Louisiana courts have held that there was sufficient evidence to support the determination that two corporations constituted a single-business enterprise where an affiliated entity handled all of the day-to-day operations for the entity at issue, the two entities shared the same office and computer systems, all of the daily operations were handled by the affiliated entity's employees, and the affiliated entity billed the entity's clients without the entity directly reimbursing the affiliated entity for any of its services. *Andretti Sports Mktg. La., LLC v. NOLA Motorsports Host Comm., Inc.*, 147 F. Supp. 3d 537, 554-55 (E.D. La. 2015) (citing to *Grayson v. R.B. Ammon & Assocs., Inc.*, 778 So. 2d 1 (La. App. 2000)).

32.     Considering the above factors, the evidence establishes that Shamrock Management and SIPCO were operated as a single-business enterprise. Most of the *Green* factors are satisfied, including at least the following:

   a.  Shamrock Management and SIPCO shared common ownership. Trahan was the sole member of both entities.

   b.  Shamrock Management and SIPCO had common officers. Trahan, Breaux and Lyons were the CEO, CFO, and general counsel, respectively, for both companies.

   c.  Unified administrative control existed between Shamrock Management and SIPCO and that the entities' business functions were similar and supplementary.

Indeed, SIPCO was formed to vet oil-and-gas E&P opportunities because Shamrock Management was not permitted to do so, and it was intended that should SIPCO have become successful, it would obtain its labor from Shamrock Management.  In addition, Trahan was the sole manager of both entities.

d.  Shamrock Management financed SIPCO by paying its expenses, including the salaries of SIPCO's employees.  (Defendants argue that it is common for related entities, including, for example, the various Aker entities, to contract for labor among themselves.  The difference Defendants ignore, however, is that the labor contracted from one related entity is usually paid for by the other related entity, as did the Aker entities, whereas, here, SIPCO never paid Shamrock Management for the labor it provided.)

e.  As discussed above, SIPCO was inadequately capitalized, especially considering the contract with Aker, the CVS, and the scope and anticipated cost of the offshore E&P project contemplated.

f.  Although Shamrock Management did not cause the formation of its affiliated company, SIPCO, Trahan, the common owner of both companies caused the formation of SIPCO to aid Shamrock Management by vetting oil-and-gas E&P opportunities.

g.  SIPCO did not receive any other business other than vetting oil-and-gas E&P opportunities to aid Shamrock Management.  Indeed, SIPCO never made any money, while incurring a large liability that was intended ultimately to benefit Shamrock Management.

h. SIPCO used the property of Shamrock Management as its own without ever reimbursing Shamrock Management.

i. Shamrock Management and SIPCO shared common employees. Although Shamrock Management had over 800 employees and only shared fourteen with SIPCO, all fourteen were employed by both SIPCO and Shamrock Management and those fourteen possessed skills that were essential to SIPCO's purpose, including geology, engineering, legal, and accounting.

j. Shamrock Management's employees rendered services on SIPCO's behalf without SIPCO ever reimbursing for such services.

k. Shamrock Management and SIPCO shared common offices. All of SIPCO's offices were also offices of Shamrock Management, even though Shamrock Management had additional offices.

l. Shamrock Management and SIPCO shared centralized accounting. Breaux was CFO of both entities, and Shamrock Management made payments to third parties on SIPCO's behalf. These accounting functions were handled by Shamrock Management on SIPCO's behalf, not by SIPCO itself.

m. In addition, it may be said that the manager and officers of each entity did not act independently in that the *raison d'être* for SIPCO was to perform the very function forbidden to Shamrock Management, using Shamrock Management's officers, offices, employees, and resources to do so.

n. And, while there is no evidence that Shamrock Management failed to comply with corporate formalities, the record on this score as to SIPCO is mixed. It failed to file annual reports but may have conducted annual meetings.

33.     Regardless, even if the evidence established that Shamrock Management and SIPCO's manager and officers acted independently in the interests of the respective entities, and even if Shamrock Management and SIPCO complied in large measure with the requisite corporate formalities, this is insufficient to prevent the application of the single-business-enterprise theory.

34.     Thus, from a totality of the circumstances, Shamrock Management and SIPCO constitute a single-business enterprise under the controlling law and jurisprudence because they are so affiliated that the legal fiction of their corporate distinctiveness should be disregarded, and they can be treated as a single entity, liable for the actions and debts of each other.  Therefore, Shamrock Management is jointly and solidarily liable with SIPCO for the debt and liability it owes to Aker.

## CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS ORDERED** that judgment be entered in favor of Aker and against SIPCO and Shamrock Management awarding Aker $1,780,144.19, plus pre- and post-judgment interest, attorney's fees, and court costs, for which SIPCO and Shamrock Management are jointly and solidarily liable.

**IT IS ALSO ORDERED** that judgment be entered in favor of Trahan dismissing all of Aker's claims against him.

New Orleans, Louisiana, this 8th day of October, 2019.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE